Good morning, everyone. We're here today for oral arguments. We're going to begin with appeal number 24-1026, Daniel Christensen et al. v. William Weiss et al. And Mr. Aiken, we'll begin with you. May it please the Court, I am Michael Aiken, and I represent the estate of Donna Christensen, buying through her next of kin, Daniel Christensen, related to several constitutional violations that resulted in Donna Christensen suffering and ultimately her suicide at the Vilas County Jail in northern Wisconsin. The District Court in this case dismissed the 1983 constitutional claims on a motion for summary judgment and also dismissed the supplementary state law claims without prejudice. This appeal presents a straightforward series of procedural issues and a more complex set of issues relating to the substantive constitutional violations. The straightforward issue is the District Court abused its discretion related to a surprise and premature summary judgment deadline and refused to allow additional time for discovery. But didn't the parties agree to a two- or three-week stipulated new deadline and requested that of the judge? I believe that when the status conference was held after the initial scheduling order was struck, counsel was wrong-footed at that point, and that was indicated in the docket entry that they were not prepared to file a motion for summary judgment. There was a prior stipulation to extend the deadline as the parties were working together and knew that the record was not ready for summary judgment at that point. Mr. Aiken, we do have quite a bit of briefing with regard to the procedural issues. I'd like to focus in, and you can certainly return to those if you wish, but I'd like to focus in on the claim against Officer Wilmot. Is the theory a straightforward one of excessive force, or is the theory what the district judge called the roundabout theory, the series of elements that would together aggregate to your thoughts with regard to a theory of prosecution? It is a straightforward use of unreasonable force against Officer Wilmot, and that use of force was captured on video, and it's our contention that Ms. Christensen's side of the story that's shown on video is not blatantly contradicted, so it would fall under the Supreme Court's decision in Scott, and there's multiple evidence of maliciousness to satisfy deliberate indifference, starting with the fact that the officer observed her susceptibility to being in solitary conditions, how that affected, you know, revealing an obvious mental illness, and he still continued to punish her for the maximum allowed punishment of what amounted to 30 additional days in solitary confinement. So let's examine that second element. As I understand the roundabout theory, first, the allegations Mr. Wilmot used excessive force to thrust Donna into him. Second, he violated her due process rights by disciplining her with his confinement, which you mentioned, and then third, his discipline combined with mental illness ultimately led to the suicide. On the second element, the violation of the due process rights by disciplining her, how is that a violation of the due process rights? How is placing her in that 10 days of segregation, how does that result in a due process violation, that second link of the chain? Yes, so the due process violation relates to the fact that Officer Wilmot was not only the officer that was involved in the use of force, he also was the supervising officer that was supposed to look at the use of force and determine if that was reasonable. So he signed off essentially complying that he himself complied with the obligations. He did that because he testified he thought that that would mean that his conduct would not be further subject to any further review. And he essentially tricked Donna Christensen into waiving her due process rights by promising her that he would put her back near people and, you know, even though she expressed 10 days was a long time to be alone, didn't tell her that she was going to be on the hook for 30 days. So it's the lack, it's the signing off on his own conduct and then also essentially tricking Ms. Christensen into waiving her due process rights that we believe is a due process violation. And just so I get the clarity on the theory, there has what we've called this roundabout theory with the three elements. The other theory would be just a straightforward allegation of intentional use of excessive force. That's also the first of the three steps in the roundabout theory, is that right? Yes, I mean these things, what makes this case complicated is the different violations sort of are intermingled, but I think combined, how you look at them, they show that the action by Officer Wilmot was done with malicious intent rather than a good faith effort to maintain order in the jail. And it was my intention to spend more time on the substantive constitutional violation issues rather than the procedural issues because those are set forth in the brief. And so those issues are whether Donna Christensen was denied a right to medical evaluation and treatment for her obvious signs of mental illness, whether there was reasonable precautions taken based on a substantial awareness to the risk of suicide, and then as you mentioned, the unreasonable use of force. In terms of the medical evaluation and treatment, we must show a serious medical need and deliberate indifference. And a response to the serious medical need or lack thereof can constitute deliberate indifference. And that can be shown if there's no medical care provided or if there is some medical care that it evidenced a complete absence of medical judgment. What evidence do we have that they are in? Linda Thayer? Yes, Nurse Thayer. Okay. What do we have of deliberate indifference there? As far as deliberate indifference with Nurse Thayer, the record is somewhat incomplete on that fact because of the summary judgment deadline that was imposed by the district court. We didn't have the opportunity to fully explore how she may have been involved in terms of setting policies that were unconstitutional. And as far as proving her deliberate indifference, if she's part of this system and would have been someone who was part of the planning of this system to say that it's adequate, where you're having someone who's unqualified and herself testified she could only give support and encouragement as opposed to any medical care, those issues still need to be developed. And that's one reason that the procedural issues in this case do bleed forward to the substantive issues in terms of the constitutional violations. We still think, though, based on the record that we have, there's enough evidence where the court can move this case forward as to the primary defendants. Nurse Thayer and there's also a physician's assistant, Scott. Gregory Scott? Yes. He's another person who, at this point, with the record being what it is due to the procedural issues, we don't have a full understanding of how he was involved. And we know that from the record, he did not see Donna Christensen, he did not evaluate her records, but yet his signature was used on the form that released her from Suicide Watch. So they were using him in order to do what they should have done, which is to have a medical evaluation of Ms. Christensen when she's showing, you know, to commit suicide and saying that it's because she's hearing constant voices telling her to kill herself for weeks leading up to her placement in the jail. Well, let's turn then to focus on Ziemba, okay, the mental health professional. I do take your point that it seems that someone who's presenting as Ms. Christensen did could use more than support and encouragement. That's the quote. And I thought that came from Ziemba, not Thayer. Does the record tell us whether this is some sort of policy of these ACH defendants? And what's routine when folks are coming into the jail who are withdrawing from their substance abuse? What does the record establish? And I understand that you're saying you weren't able to finish developing some things because of deadlines, but what did you have in there? Yes, in terms of what we have in the record, we know that Kayla Ziemba testified that she could only provide support and encouragement and couldn't even refer out for any medical evaluation or treatment because it wasn't allowed under her understanding of the law. I think a reasonable inference can be made that she must have gotten that understanding from her training from ACH, and that was their policy that they're not going to allow her as a qualified mental health professional, regardless, to refer someone for medical evaluation or treatment until they get out of the jail. So we think that that is an important part of the record in that regard. And by that, because to me it was not clear from the record, was she talking about refer out for medical evaluation and treatment of the withdrawal, the substance abuse issues, or specifically the mental health issues? I believe that that was related to the obvious signs of mental illness. In terms of when Donna Christensen turned herself into the jail because she was out on parole, she was withdrawing from drugs, and an officer noted that she was having severe withdrawal symptoms and said she should be seen by a nurse. No nurse ever saw her for that, and she was put into essentially what amounted to solitary conditions for COVID precautions. The Wisconsin law and the jail policy says you've got to have a medical evaluation within the first 30 days, and that didn't even happen in this case. Was she being held out, I guess, by ACH as a clinical social worker? She was held out by ACH as someone who was properly qualified to be a mental health professional in the jail. However, even according to the jail's own job description, it required someone who was fully licensed. And that's why I'm taking you back to my question. I understand what the policy is. I need to know whether or not she was being held out as a licensed social worker to be in compliance with that policy. I believe she was being held out by ACH to be compliant with that policy. However, it's worth noting at the time that she was working toward her licensure, the only way you can do that is if you're having supervision from someone who actually is licensed and is trained. And in this case, there's no evidence at all in the record that she was ever trained, and there's no evidence to suggest she was ever actually supervised. The person, Melissa Caldwell, who's not a part of this case because we weren't allowed to add her due to the procedural issues with the summary judgment deadline, Kayla Ziemba testified she was never even at the jail. She was never present for any of her interactions. And to me, the fact that Kayla Ziemba didn't as much as consult her supervising person in a case like this speaks volumes in terms of what that relationship actually was. And the district court just assumed that that supervision was present, and there's no evidence that that actually occurred in the record. Thank you. Mr. Aiken, let me contrast a statement Judge Peterson says on page two. Plaintiffs concede that they can't prevail in showing that any of the defendants were aware of a substantial risk that Christensen would commit suicide. But then the argument, obviously, that you end with in your brief is a reasonable jury could find defendants were deliberately indifferent to a substantial risk of suicide. Is your position that the district court incorrectly apprehended your theory? Yes, Judge, it is our contention. I don't know where the judge in the district court got that, made that conclusion. But I think what it was is there's a difference when you've got someone like Donna Christensen who's had a history of suicide attempts, threatened suicide, a vulnerability to solitary conditions, and obvious signs of mental illness. You don't need to have immediate signs like you would for someone who's a sane person and having momentary signs of suicide to be able to stop them. When you take someone and you put them in that position with everything that Donna Christensen had, you take no reasonable precautions whatsoever, and you give her no medical evaluation. Our contention is that that substantial risk of suicide is still existing. She essentially went from suicide watch, the frying pan, right into the fryer. And now she got put in a part of the jail where she was completely isolated for the last 10 days of her life and nothing was done. And so that's the difference where I think the district court may have misapprehended that. Would you like to reserve the remainder of your time? I would, Judge, thank you. Thank you very much. Thank you, Mr. Aiken. Mr. Knott, we'll move to you. May it please the court. Good morning. I'm Doug Knott. I represent the defendants of Pelley's, Linda Thayer, Greg Scott, and Kayla Ziemba, as well as their employer, Advanced Correctional Healthcare. We're here to ask that the court affirm dismissal of the claims against those defendants. Mr. Knott, do you mind if we start with Kayla Ziemba and whether or not she was being held out by Advanced Correctional Health as a clinical social worker able to provide this mental health diagnostic testing or what have you? I don't know what policy Mr. Aiken was referring to. She is a qualified mental health provider, which is a defined term by a national organization called the National Commission on Correctional Healthcare. And they have standards on mental health and it defines in there what a qualified mental health provider is. It's in record at docket 37-5 at page 2. And in there, it lists a series of professionals that can qualify as qualified mental health providers. Among them is psychiatric social worker and then there's a catch-all that says others who by experience or training are qualified to perform risk assessments, suicide risk assessments. Well, she was going a little further than a risk assessment. I'm sorry? Was she providing care beyond that of a risk assessment? I think an advanced social worker would be able to do that as well. She was. Under Wisconsin law and it's the administrative code MPSW at 6.02 and 6.04, an advanced practice social worker is permitted to intervene in difficult situations. That under 6.04, a licensed clinical social worker is permitted to diagnose, treat, and a whole list of other activities that they can engage in clearly providing therapy in a jail. And under Wisconsin law, Ms. Ziemba was not only acting under her certificate as an advanced practice master level social worker but also was in training to become a licensed clinical social worker. Going back to my question, I believe that ACH accepted below that Ms. Ziemba in this instance was providing licensed clinical social work services. And so, I'm trying to tie up if she could do the risk assessments but she was doing more here and the allegation is deliberate indifference, what would have qualified her, I guess, under that training or supervision that I can go to in the record to demonstrate that she could, I guess, exercise that function? I think she was acting, she certainly was qualified under, as the court observed, she was qualified under Wisconsin law to practice licensed clinical social work. The plaintiffs have never articulated a standard. But see, that's where I think I disagree with that finding. When we look at Wisconsin law 457.04, one of the prohibited practices is engaging in licensed social work and not being supervised by a licensed social worker. So, I'm looking for the tie-up. And she was supervised. We proposed as fact at record 74 paragraph 111 that she was supervised by a doctorate level clinical psychologist and that was not disputed. Would Dr. Caldwell, though, agree with this statute? Yes, and that's explained in in Ziemba's affidavit that was submitted. That's record 40. And we ultimately, she explains, Ms. Ziemba does in her declaration, that her hours that she put in at the Vilas County Jail were submitted to the state for her approval to become a licensed clinical social worker. And I guess where the disconnect is, is that there's nothing on the record that shows that Dr. Campbell could stand in the shoes of Dr. Caldwell, I'm sorry, Dr. Caldwell could stand in the shoes of a licensed clinical social worker under the prohibited acts. Where you're talking are more so focused on what would have eventually qualified Ms. Ziemba as a licensed clinical social worker. What I'm wanting to direct us to is where in Wisconsin law could she act as a clinical social worker while being supervised by a psychologist? I believe that, if we get into the weeds in there, in the exact description of how the supervision occurs, I believe that's 457.08 sub 4 and then the paragraphs below there explain how that supervision occurs. And a doctorate level clinical psychologist is approved and ultimately was approved in Ms. Ziemba's case as a supervisor. But to go back to your first question, I think that the question is whether Ms. Ziemba was, well one is whether she was acting within the scope of her authority, which given the information that was provided to her, she certainly was. Whether it required a clinical intervention or just the assessment of an advanced practice social worker. She performed the initial risk assessments. She saw Donna Christensen four times in two weeks. And after she performed the initial risk assessment, it wasn't support and some kind of fuzzy help. It was, they worked on self-worth, but most importantly she worked with her and counseled her on drug recovery. It's not clear from the record, but you could explain who made the determination that she could come off of, Donna could come off of Suicide Watch? Ms. Ziemba did on the basis of her assessment on October 8th. And Mr. Aiken's reference to PA Scott is off the mark. Mr. Scott did not need to do a medical evaluation. He was just acknowledging that he's aware that she came off of the watch. We need to go back to Ms. Ziemba. Let's assume she's qualified. She had in her arsenal knowledge of Ms. Christensen's past mental health issues and suicidality because she had prior knowledge of Ms. Christensen. She had previous experience with her for months before when she had been at the jail. So when you marry that prior knowledge with what Ms. Ziemba is telling her in that first encounter about her hallucinations and thoughts of self-harm, and you also marry that with the fact that she's withdrawing from drugs, what are we to make of that, that within a minute's worth of assessment she takes her off Suicide Watch in one day? Why is that not a reasonable thing that Mr. Aiken is asking us to look at? It's more than that. First of all, there was a suicide assessment mechanism. There's a questionnaire called an ASQ that was used, which is within her professional judgment. But beyond that, on October 8th, in her interview, Ms. Ziemba learned that Donna had self-insight, that what she had been going through and what made her, she said, spaz out was a concern about withdrawal. And Ms. Ziemba was assured on the 8th that she was past that. But she came back on the 12th to make sure of that and did a long tele-medicine, because it was COVID, did a long interview, and came back again on the 20th to make sure that she was doing well. So the most important thing that she did as a social worker was implement a safety plan. That's the plan that was put in place, was to keep close watch on her, make sure she was articulate, make sure she was asking for her needs, and she did. I'll be honest, one thing that concerns me is when Ms. Ziemba first sees her and tells her, I'm going to put you on suicide watch, Ms. Christensen's reaction is, I'm not going to talk to you then. As in, I'm not happy with this decision to be on suicide watch. So then Ms. Ziemba shows up the next day and all of a sudden, Ms. Christensen is reporting, I'm cured. I'm fine. So when the court is drawing depth or scope of Ms. Ziemba's care, one issue there is whether Ms. Christensen determined she had to say whatever she needed to say when Ms. Ziemba shows up the next day to make sure she gets off suicide watch. And if that involves reporting that I'm no longer feeling the way I was feeling the day before when you told me you were putting me on suicide watch, that becomes an inference that it could be reasonable for a fact finder to draw. It's a very troubling circumstance where the mental health provider is trying to assess whether the client is, in fact, misleading them to get off a suicide watch so that they could do that. On the other hand, she also knows that it's very uncomfortable, and as this court has acknowledged, it's very uncomfortable to remain on suicide watch. And so she's trying to balance that. But I think the important thing is to recognize that from her last statement that she had a mental health concern, the next day she had insight and my client did know her from when she was a child. She had worked with her in the child welfare system. And there was no activity, there was no suggestion in all of those contacts from October 8th to October 26th when she committed suicide. There's not a single fact that suggests that she was delusional, needed care, that she was asking for help. There's not a single fact to that effect. And that's why it would not be a fair inference to suggest, particularly under the Eighth Amendment, that Ms. Ziemba should have conferred on the 8th that she would be eminently suicidal or that she would commit suicide 18 days in the future. Thank you very much, Mr. Knott. We'll now move Mr. Jones to you. Good morning. May it please the Court. I'm going to start, if I may, where you did, Judge Brennan, with the question about the claim against Sergeant Wilmot. That is, whether there are separate standalone claims, excessive force due process, or whether it's part of one larger theory. And I would say it's been both at times in this case. But to me, the answer is the same, whether they're considered as individual claims or wrapped up in one larger claim against Sergeant Wilmot. I think the record is clear on the excessive force component, principally pointing the Court to the video recording, as Judge Peterson found, that that speaks for itself. And it points to an absence of excessive force on Sergeant Wilmot's part. And considering that with the factors that the cases say are relevant, he had a good faith reason to use the force he used to pull the mattress from the cell to hold Ms. Christensen against her bunk only briefly. He had a good faith reason to do both based on what was occurring in the cell. The amount of force he used was reasonable in relation to what was occurring. If we, having reviewed the video, come to a different conclusion about whether it conclusively shows that Ms. Wilmot shoved him in a way that would make his return force proportionate, do we then have a jury question? I think ultimately, the answer to those factors, that is whether he had a good faith basis to use the force, whether the amount of force was reasonable in relation to its purpose, whether he tempered the use of force, and whether there was injury or pain that was caused, stand independent of the question of whether Ms. Christensen pushed Sergeant Wilmot. So I think the answer is the same, even if the Court has a question in its mind about what that video exactly shows. Because even if she hadn't intended to push him, there's still physical contact between the two of them. There's still the larger context of what holding her briefly for less than 10 seconds against her bunk without using any additional force, I think under the circumstances was reasonable. And I don't think there's any evidence that it was done maliciously and sadistically for the purpose of causing harm. So I think the answer is the same, Your Honor. As to the due process claim or component, Your Honor asked the question, why is there a due process constitutional violation from putting her in disciplinary segregation for 10 days? And I think the answer is that there isn't. I'll come back to that. But outside of those 10 days of disciplinary sanction, Ms. Christensen- Was there an overlap between... Because I think this is still during COVID, and so there's still a two-week... Yes, there is an overlap. And that timeline is important. Because when she was on COVID quarantine, or when she was in medical segregation because they were waiting for a test, and then when she was after she came off the discipline and was simply there based on her classification status, those are administrative decisions that the case law of says are not subject to due process concerns. For that 10 days, from October 6 to October 16, eight of those days, she was still on a COVID quarantine. So her status really wasn't any different being on discipline, except that she had privileges removed. But the fact that she was in her cell for 23 hours each day, that would have been the same whether or not she had been on 15th, 16th, and October 15th and October 16th. But can you address Mr. Aiken's point that not only were there those two days after the COVID hoax, she's in these two extra days of the 10 day, but also according to Ms. Christensen, he tricked her or failed to mention to her that there'd be 20 extra days. So now we're talking 15th, 16th, up through the 26th, she's still in the same posture now regardless of COVID. Can you address that? Because that's what his answer was to Judge Brennan about the due process concerns, that situation, and then also signing off on his own discipline, those two things. So a couple of things, or I guess to sort of unpack that, for those last 10 days when she was confined based on a classification status alone, the circumstances weren't the same. Yes, she was still in a cell for 23 hours a day, but she had all of her other privileges returned. She had access to mail, reading materials, television. She was able to have contact with family and friends both over the phone and via video means. So the circumstances weren't entirely the same, but the issue of Sergeant Wilmot tricking her or not, there's an audio recording of that conversation that's part of the record, record 59-32. Sergeant Wilmot, as plain as day, asked her, do you want to appeal it to the next shift or accept it? And Donna responded, I'll accept it and then sign. This idea that Sergeant Wilmot tricked her... No, no, no, no. I'm aware of that part of the record. I'm aware that she chose not to appeal it to the next shift. I'm asking about her understanding that this was not just 10 days, it was actually 10 plus 20. Because I don't get that from that exchange. Well, in part I would say to accept Mr. Aiken's argument there is to accept that there's an affirmative duty on the part of the officer under the Constitution to explain all aspects of what the discipline might entail. And I'm not sure that the cases point to that. I'm sorry, I lost my train of thought. Except doesn't he kind of do the opposite? Because he says when your COVID test comes back, I'll put you by people. And that's actually not going to happen because she's got 10 plus 20 days of isolation left. Well, in fact, that's exactly what happened because her COVID test came back on October 8th. And as a result, she was removed from medical segregation and put in the D block where there were other inmates. So she was taken from medical segregation where she was entirely by herself and put in a housing unit or pod where there were other inmates. That was still segregation though, because she was her cell 23 hours a day, correct? Yes, but that's not inconsistent with saying you're going to have 10 days of discipline, which she would have understood. And there was even part of that conversation that made it clear she understood that that means you're going to be in segregation for those 10 days in your cell 23 hours a day. But she was in a cell block where when she was out of her cell, she was able to converse and communicate and interact with other inmates in the cell. And there were other inmates in the cell, in the cell block, and there were other inmates in the cell block. Thank you, Mr. Jones. Mr. Aiken, we'll move back to you now. Two minutes for rebuttal. Thank you. This case presents a very important issue related to mental health, which is becoming an epidemic in our country. Jails are now the biggest provider of mental health services, and particularly to those who are in the most vulnerable segments of our population. Donna Christensen was part of one of the most marginalized groups in our country. She's a Lac du Flambeau Indian, where drug use is rampant and there's a lack of access to traditional medical care. In fact, 45 percent of the inmates in Biola's County Jail are from her tribe. Deliberate indifference, the standard is evolving, and it's about decency and human decency. And paying lip service to the right to provide medical care for serious mental illness, support and encouragement, instead of medical evaluation and treatment, a signature of a doctor instead of actually having a doctor evaluate the person, is not conforming with the standard of decency. It's not treating Donna Christensen like a human being, despite that she's from a marginalized group. And society has an obligation to do better, and the Constitution provides that guarantee for people like her. Ms. Christensen has a right in this factual record to move forward with her 1983 claims. This court should address those issues to move this litigation forward to the extent the record allows it. The procedural aspect of this case also needs to be put on its tracks. So there's two good reasons for this court to reverse the summary judgment from the district court, remand this case for full discovery, and allow the full evidentiary record to be presented to the jury to see what they think of her treatment at the Biola's County Jail, and whether it conforms with the standards. And also, we would request that the state law supplementary claims that were dismissed without prejudice also be reinstated. Thank you. Okay, so we're taking our advisement. We'll move now to Appeal 24-1056, Philadelphia Indemnity Insurance Company et al. v. Kinsey Incorporated. And Mr. Zudima, we'll begin with you. Thank you, Your Honor. May it please the court. This case is procedurally complicated, but legally straightforward. The only issue the court has to decide is whether Kinsey's policy covers the state court's judgment for breach of contract. Kinsey and its insurer agree that the policy... Do you mind if we start at the two arguments of the kind of the lower end, the double recovery. Is that reviewable by this court? Yes, I think it is, Your Honor. I think this goes to the waiver issue. I'll just point out that Kinsey argued this issue more than once in the district court, including in the briefing on the motions that were resolved and are now on appeal. I'll direct the court's attention to Docket 60 at page 2, as well as Docket 12 at page 8-9, both those briefs specifically. Docket 60, I thought you had conceded that you only raised it in your TRO motion. So has that changed? We didn't concede that, but I admit that we did not cite Docket 60. I realized that as I was preparing for this oral argument. So we did actually cite it. This was in response to the other parties' cross-motions. So I'm going to ask again, did you concede, though, that you only raised it? I know you're raising Docket 60 now, but before, were we only looking at Docket 12? That was the only one cited in the brief, yes, Your Honor. I apologize for that. All right. And so why are we able to review it now? We're able to review it because I think it was adequately preserved in the district court. This concept of double recovery sort of permeates this case. That's what it ultimately comes down to is whether Bellin should be able to recover again for what amounts to the same injury for which it already recovered from the settlement. I'm happy to address this double recovery issue more if Your Honor would like. I'd really like to focus my time on the language and the purpose of the policy. And what about the reservation of rights, the equity argument? Is that one waived as well? No, Your Honor, that's not waived. And so seeing that Philadelphia Indemnity agrees that the policy should apply, why would the reservation of rights argument apply in this instance? Your Honor, the district court dismissed the argument in a footnote because Philadelphia Indemnity is not contesting coverage. But that, to me, really proves the point. The policy is a contract between the insurer and its insured, and they both agree that it covers the judgment. The only one who disagrees is not a party to the contract. And so if anything, that suggests that the policy does, in fact, cover the judgment because that's how the parties to the contract interpret it. But in any event... But doesn't the estoppel argument only come into play if the insurer disputes coverage? I missed the last part of your question. If the insurer disputes coverage, isn't that the only instance where estoppel comes into play? If we raised it as an estoppel argument, that's when it would come into play. But I think it's more than an estoppel argument. In any Illinois case, any Illinois court, have they employed this reservation of right argument when the insurer is not contesting? Not that we found, Your Honor. All right. So let's move to the wrongful act and walk our way through it. Happy to. Thank you. The district court, just to back up and look at the big picture, the district court held that the policy does not cover the judgment because the policy covers only negligence and it excludes all claims for breach of contract. That narrow reading of the policy defies its text. It overlooks the basic purpose of an errors and omissions insurance policy, and it makes the policy all but meaningless to a small business that conducts all of its work pursuant to contracts. The end result, as I indicated, is that Bellin gets to recover $1.75 million for an injury worth less than half of that, and Kinsey might as well not have had any insurance at all. I'd like to focus on the grant of coverage first and then turn to the exclusions, which is how courts typically approach insurance contracts. The policy covers any wrongful act, which is defined to include a negligent act, error, or omission committed in the rendering of professional services. The district court read this to mean it covers only negligent acts, negligent errors, and negligent omissions, and that the judgment was not covered because it was not based in negligence. The district court erred in both respects. First, coverage is not limited to negligence, and it's key, I think, for the court to remember that in interpreting an insurance policy like this, the court must construe it as a whole, take into account the type of insurance and the nature of the risks involved and the overall purpose of the contract. That's how this court described it earlier this year. The Bellin's brief calls the policy a standard errors and omissions policy, and that's exactly right, and the purpose of a standard errors and omissions policy, again, as this court explained in the Crum decision, is to ensure members of a particular professional group from liability arising out of the special risk such as negligence, omissions, mistakes, and errors inherent in the practice of the profession. Under the most reasonable reading of the policy in light of its purpose, it covers not only negligence but also errors and omissions that might not meet the legal definition of negligence, although I'll note they probably often do. I'm wondering how your reading doesn't lead to moral hazards. If intentional errors and omissions are covered, an insured could just decide to stop performing on a contract knowing that their insurance company will be on the hook to defend them if they are ultimately sued, even if their behavior was dishonest. A few responses to that, Your Honor. First, I think the policy as a district court construed it incentivizes perverse outcomes because it covers negligence. A company is indemnified for its carelessness, but not when it makes actual honest mistakes, even despite due care, and that does happen. I'm sure it happens all the time, is that something goes wrong in a big project, even though you did everything you could to prevent anything from going wrong, and so that, to me, is what the Supreme Court calls a contextually implausible outcome. Also, errors and omissions are not defined by the policy, so the court construes them under their ordinary meaning, and I don't think anybody construes a word like error or omission to mean a deliberate, intentional, deliberately wrongful act. I think most people recognize that it means an accident, something that you didn't mean for to happen. You made an error. You made a mistake. Is this the best case to make that argument? There's certainly a whiff in the record that global HR did not get installed, maybe because of negligence, but maybe not. Your Honor, I think, and that leads me right into Bellin's argument, which is that this was a knowing, deliberate breach of the contract. I'll start by just making clear the trial court did not make... Before we move, do you mind answering the question that Bellin does raise, and that's this contention that the argument regarding the proper construction of wrongful act was not raised below, that this argument is also made? Well, Your Honor, the district court based its decision on its interpretation of the policy under the pressed or passed upon rule. It was preserved because that was the basis for the court's decision, and we're allowed to challenge that on appeal. But turning to the record from the trial court, I just want to make clear that the trial court did not find that Kinsey knowingly, deliberately breached the contract. The district court didn't make that finding. The jury didn't make that finding, and I don't read anything in the trial court to support that finding. The trial court, when it directed its verdict, never suggested that it was finding Kinsey purposely, or deliberately, or maliciously breached the contract. And the jury, I'll note, rejected every claim that required any finding of intent, including punitive damages, including the fraudulent misrepresentation claim. But looking to what actually did happen in the trial court, the court acknowledged, when it issued the directed verdict, what it called the period of confusion surrounding Kinsey's obligations. It stated, quote, there's evidence to support that. It recalled, and I'm quoting again, the representative of Bellin asserted that the GHR module is too new, and it said it cannot draw the conclusion that there's no evidence that there had been conversations about that. And if you read the transcript, there's a lot of discussion that took place in meetings and on phone calls between Bellin, between Kinsey, the software developer, about what version of the software Kinsey was supposed to be implementing. There seemed to be confusion about the terminology that was used, because there was terminology for the broader project, there was terminology for the narrower module, there was a version 10, there was a version 11, and I believe the module itself was updated during all of this, and so the trial court acknowledged this. There was confusion. Is what you just said and referenced the reason for the Tomei agreement? I'm sorry, I'm not sure I understand the question. The confusion that you're talking about, is that the predicate for why this Tomei or Thome agreement ended up getting negotiated? Well, actually, Your Honor, I'm not sure why that got negotiated, because we weren't involved. Kinsey was not involved. When we found out about it, we objected to it, because the insurer, in its view, maxed out the policy on a settlement that we had nothing to do with. So I hope that answers Your Honor's question. And that was during trial? That was during trial. That was after the first week of trial over the weekend. And then I'll note, the first thing they did on Monday morning is dismiss the negligence claim. And so Kinsey was left without any coverage for the rest of the trial. But in any event, I want to discuss the series modifier canon. That's what the district court relied on. First, I'll point out that the court never once addressed the purpose of an errors and omissions policy. It never addressed the types of risks that the insured is trying to insure against when it purchases a policy. It relied on the series modifier canon. That canon applies most forcefully when it would be odd to apply the modifier to only the first item in a series, when it would result in a contextually implausible outcome. And to address Your Honor's question from earlier, there is nothing implausible about a policy that covers non-negligent errors and non-negligent omissions, as well as negligent acts. That would not mean the policy would cover deliberately wrongful conduct, because I don't think that's a reasonable interpretation of the phrase error and omission. And even if those words could be construed that way, we have exclusions. The exclusions here specifically exclude deliberately wrongful conduct, like dishonest, fraudulent, criminal, malicious conduct, and knowingly wrongful acts. And so we don't think that's- How does that dovetail into your argument regarding exclusion A? Exclusion A, Your Honor. Again, we think Bellin's reading of exclusion A results in a contextually implausible outcome, because under Bellin's reading, the policy covers only negligent errors and negligent omissions. The exclusion excludes errors and omissions that are dishonest, fraudulent, et cetera. And then the policy says nothing at all about the errors and omissions that the insured is most interested in insuring against. The whole reason it bought the policy was that it knows mistakes might happen even if they try and do everything right and they use reasonable efforts. That to me, again, is a contextually implausible outcome. And I'd like to reserve the remainder of my time. You may do so. Thank you. Mr. Brown, we'll move to you. Good morning. May it please the court. This case is not an insurance coverage dispute between an insurer and an insured. It's about a set-off provision in a settlement agreement. Under that provision, Kinsey is entitled to set-off only if Kinsey's professional liability insurance policy provides coverage for the judgment arising from Kinsey's knowing breach of contract. This insurance policy does not cover wrongful acts committed knowingly. It doesn't even cover contract-based liabilities at all. It is limited solely to negligence. Without evidence in the record of can be no coverage, so there is no set-off under the settlement agreement. The district court thus correctly found that there is no coverage, so there is no set-off. It was right for at least three reasons. Number one, Kinsey's liability arose from a breach of contract done with knowledge that it was a wrongful act, which means coverage is excluded. Number two, Kinsey's insurance policy covers only negligent acts, negligent errors, and negligent omissions. And there was, as the district court put it, not one crumb in the state court's analysis to support negligence. And number three, nothing outside of the policy compels or even suggests a different result, and this court should affirm. On my first point, though the district court did not rely on exclusion FF in its ruling, I think it makes sense to start there because everyone, even Kinsey, agrees that there is no coverage for a wrongful act done with the knowledge that it was a wrongful act. So let's get into the facts. Kinsey contracted with Bellin to implement a software called Global HR, but Kinsey didn't follow through and do it. The record in this case shows that while this 15-month-long software implementation project was still underway, Bellin learned that Global HR was not being implemented. Bellin then confronted Kinsey's president, Brad Kinsey, to demand that Kinsey make good on its promise, but he refused and demanded over $136,000 of additional compensation above the contracted amount and in addition to the over $1 million that Bellin had already paid to have Global HR be implemented. That was the breach. The project was in flight. Kinsey could have still performed and avoided breaching the contract entirely, but decided not to. Kinsey made a business decision. It chose not to follow through on the services it promised to deliver for a fixed price, knowing full well it was obligated to complete those services under the contract. Can I interrupt you? And I do want you to go back on the train you're on. I take it from your presentation right now that you're saying for us to determine the relevant coverage, we should and could look beyond the mere fact that the state court found for Bellin on the breach of contract claim, look past that to the underlying events. To the proofs at trial, your honor, yes. Or can we just look to the actual judgment? Yeah, your honor can look to the judgment, to the state court's analysis to the judgment, and to the proofs at trial I believe is the standard for analyzing the duty to indemnify after a judgment has been entered. Okay, because you're going through the proofs at trial. I am, your honor. But it may not be necessary. It may not be necessary, but I think the facts are very strong under the circumstances here, and they're kind of swept under the rug by Kinsey's presentation, and so I'm trying to bring them to the floor. Okay, thank you. So this resulting knowing breach of contract was done with the knowledge that it was a breach, so the resulting liability falls squarely within exclusion FF, and there is no coverage. To be clear, this was not an honest mistake, as Kinsey would now have it. Let's compare the undisputed facts here to the honest mistake example from Kinsey's reply brief. So in that example, a contractor is hired to pour concrete, is handed a contract with a misprint that makes the start date of the project look like May 1 instead of May 7. He goes to the job site on May 1, pours the concrete, and ends up all kinds of damages. To make that hypothetical work for this case, it would be that the concrete guy went to the job site on May 1, but there's a project manager there saying, hey, we're not doing this on May 1. We're doing it on May 7. Don't pour the concrete, and the concrete guy pours it anyway. That's precisely what we have here. It's not an honest mistake. Kinsey tries to avoid exclusion FF by obfuscating the record, claiming that there was some kind of confusion about whether global HR was supposed to be implemented. While any purported confusion would not make this a covered claim under the policy regardless, it still merits dispelling this myth to explain why exclusion FF plainly applies. The record here shows that Kinsey's president, Brad Kinsey, knew exactly what he was required to do under the contract. In fact, Kinsey's trial counsel in the Wisconsin trial on the record had to admit that Mr. Kinsey was never confused about his company's obligation to implement global HR. Now recall that Kinsey and Mr. Kinsey were on trial for fraud. Confusion would have been quite helpful to their defense. So if their trial counsel could have pointed to evidence of Mr. Kinsey's confusion, he certainly would have. But he couldn't, so he didn't. This claim of confusion is nothing but a red herring. Kinsey also points to the jury forum where the jury rejected a finding that Kinsey acted maliciously or with intentional disregard for Bellin's rights. This argument fails for two reasons. First, setting aside that this section of the jury forum was about punitive damages which are irrelevant to a breach of contract claim, malice or intentional disregard of rights is not what triggers exclusion FF. It requires only knowledge. And on that point, the record is clear. Kinsey knew that it was not implementing global HR and that it would breach the contract not to implement it, but it still chose not to do what it had promised. The second is this court's ruling in Baylor. There the court drew a sharp line between an intentional breach of contract and some kind of bad faith motive. And a bad faith motive is what the jury was asked about here. Kinsey's motive or mindset in breaching the contract as the court held in Baylor is irrelevant. Moving on to exclusion H, and this one the district court did address and correctly found that it applies. That provision excludes claims arising out of any expressed warranties or guarantees or any liability you assume under contract unless you would have been legally liable in the absence of such contract. What do you do with the argument this morning that it was unclear what the requirements were under the contract? So Mr. Kinsey was the president of Kinsey and Kinsey and it's crystal clear on the record that he was never confused. The only confusion that was cited by Kinsey was the confusion of an employee of the software developer, a woman named Kathy Kapp, who was an employee of Infor Lawson. She was perhaps confused about what Kinsey, about what Bellin wanted or what Kinsey was doing, but Kinsey and Brad Kinsey, there's no evidence of their confusion. So getting back to exclusion H, here the claim arose out of express warranty that Kinsey made in his contract with Bellin to follow the agreed upon statement of work and implement global HR. Kinsey tries to avoid this one by arguing that assume does not mean what the dictionary says it means, which is to take to or upon oneself. That's the first definition in Merriam-Webster and it says nothing about taking anything from third parties. And let's think about the extraordinarily common phrase, assume the position. That doesn't talk about third parties and it's one of the most common uses of the word assume. So here, you have no liability, then you take one on pursuant to a contract, that is excluded. In addition, the verb assume in exclusion H does not even apply to express warranties under exclusion H. The policy just excludes any claims arising out of express warranties. And in its contract with Bellin, Kinsey expressly warranted that it would strictly follow the statement of work, which included the implementation of global HR. So exclusion H applies two times over. The district court was also correct in ruling that this exclusion does not render the policy illusory. There is still plenty of coverage, because the exclusion carves out legal liabilities that would have existed in the absence of the contract. That carve out was missing from the Forrester case on which Kinsey relies and makes it distinguishable from the facts here. For example, the negligent misrepresentation claim that Bellin alleged but later dropped after the Tome settlement, that would still be covered because Kinsey had a common law duty not to make negligent misrepresentations, not a contractual duty. Or say Kinsey had tried to implement global HR but ended up crashing Bellin's entire system due to negligence. That would still be covered. And let's not forget, the insurer paid out a million dollar settlement on Mr. Tome's behalf based in part on his potential liability under common law for his misrepresentations. So there is coverage, just not for Kinsey's failure to perform on its contracts. Moving on to my second point, the district court also correctly ruled that there is no coverage because Kinsey's breach did not qualify under the policy's grant of coverage for wrongful acts. That is, negligent acts, errors, or omissions. There was no negligence that precipitated Kinsey's breach. Indeed, as the district court concluded, there is, quote, not one crumb in the state's court's analysis supporting the idea that the court thought that the breach of contract occurred due to negligence, end quote. In this appeal, Kinsey has not identified any crumbs that the district court missed because there are none. In making this ruling, the district court followed a long line of precedent, well over a dozen cases from state and federal trial courts and appellate courts around the country that have consistently held that the phrase negligent acts, errors, or omissions means negligent acts, negligent errors, or negligent omissions. This interpretation makes sense. As several of these cases set forth, it aligns with the series qualifier canon. It also aligns with the rules of English syntax under which a leading modifier, followed by a comma-separated series of nouns, modifies each of the subsequent nouns. It also aligns with the other provisions of the policy, specifically Exclusion A. That provision excludes claims arising from any dishonest, fraudulent, criminal, or malicious act, error, or omission. Kinsey admits that the series qualifier canon and general rules of criminal or malicious modify each of act, error, and omission. The definition of wrongful acts in the policy is structured the exact same way. An initial adjective, negligent, followed by the same three nouns, act, error, or omission. These two provisions within the same policy, with identical structures, should be interpreted the same way. It also aligns with this court's ruling in Baylor, which I mentioned before, where it was held that intentional non-compliance with a contractual obligation is not covered by an insurance policy that covers negligent acts, errors, and omissions, even if the non-compliance was done in good faith. In that case, on advice of counsel, there is still no coverage for knowing or intentional breaches of contract. Under a policy with identical language to the policy at issue here, motives don't matter, only actions, which cuts against Kinsey's position about an honest mistake even being covered in the first instance. Kinsey did manage to find three cases supporting its reading of the definition of wrongful acts, a Massachusetts state court case from 1995, a California state court case from 1958, and an Iowa state court case from 1993. These cases, all of them non-binding, are unpersuasive. The origin of these three outliers is HSN, the California state course from 1958. But this ruling was expressly based on the court's assumption, not an analysis of the phrase, negligent acts, error, or omission. In fact, none of the parties, including the insurer, even argued that the word negligent modified errors or omissions. Instead, the court concluded that, quote, it must assume, end quote, that the word error would have its ordinary meaning unmodified by the word negligent. It did not cite the series qualifier canon. It did not cite the rules of English grammar and syntax. It did not contend with any arguments or authorities going the other way. This is not a persuasive case. The Massachusetts state case, USM v. First State, simply follows HSN and again relies on the plain meaning of the word error without regard to the modifier, negligent, that precedes it. No mention of the series qualifier canon, no mention of the rules of English grammar and syntax, and no grappling with the host of authorities going the other way. The Iowa case, Employers' Reinsurance v. Mutual Medical, made the same mistake, concluding, without any analysis at all, that negligent did not modify error or omission. That's it as far as cases that Kinsey cites in its favor that interpret the same phrase. Other cases it cites are parsing phrases with a different structure, such as error, omission, or negligent act, where the term negligent clearly does not modify anything but the word act. Those cases are irrelevant to this analysis. The cases on point that Kinsey cites, however, are true outliers. They fly in the face of interpretive canons and the generally accepted structure of the English language, and this court should not follow them. But this discussion is purely academic because Kinsey's argument rests on the notion that if it can rewrite the policy to remove the negligent modifier from error and omission, it can shoehorn Kinsey's contract breach into coverage as an honest mistake. But again, this was not an honest mistake. Kinsey knew its contractual obligations, had every chance to perform them, and chose not to. Now to my third and final point, Kinsey's other arguments that the policy is ambiguous, that the insurer waived coverage defenses by failing to issue a reservation of rights letter, or the belated assertion of double recovery, none of them warrant reversing the district court's ruling. The policy is not ambiguous. The words are clear and not reasonably susceptible to different interpretations. Moreover, and perhaps more importantly, the cases on resolving ambiguities against the insurer only arise in the context of insured versus insurer, which is not the case here. And I see that I'm out of time. Unless the court has any questions, I will step away. No, thank you, Mr. Brown. Thank you, Your Honor. There is coverage, just not for Kinsey's failure to perform on his contracts. That is how Bellin interprets the policy. That policy provides cold comfort to a small business who only performs business pursuant to contracts. And in every case where something could go wrong, will be sued in contract. That is not what Kinsey thought it was getting when it bought its insurance. It's not what anybody would think they're getting with an errors and omissions policy. It's not a contextually plausible outcome. The insured is left with a sliver of the coverage that he reasonably expected from his policy. And I'd like to address, I did not get much time to address the exclusion, but that came up. I'd like to address exclusion H first, if I may. That was the basis of the district court's decision. Again, that would make the policy meaningless, especially when the economic loss doctrine might apply to contracts like this that would result in Kinsey only being sued in contract. And so in that event, the policy might as well not even exist. But setting that aside, the district court misread the exclusion. The exclusion removes from coverage any claims for liabilities you assume under contract. My opposing counsel cited Webster's online dictionary and nothing else. We cite several cases that actually interpret the word assume in a legal context. The contract does not say assume the position. It says assume the liabilities. And so, or it says assume under contract, rather. So we think the language of the exclusion is clear, and we think it was misinterpreted. If exclusion H does apply, it's illusory. The exclusion uses remarkably broad language. It excludes claims arising out of, resulting from, based upon, or in consequence of, directly or indirectly, any express warranties or guarantees or any liability you assume under contract. I can't imagine a broader provision. And it's certainly broader than the exclusion in Crum, which this court held, well, the exclusion in Crum excluded claims just based upon or arising out of breach of contract. That is a comparatively pretty simple provision. And there, the court held that that even narrower language encompasses any claim that involves the contractual relationship. It's the same outcome here. As the district court recognized, Kinsey does not render professional services without a contract. So the policy covers only certain acts that necessarily involve the contractual relationship, and then it excludes all acts that involve the contractual relationship. That is the definition of an illusory policy. Thank you very much, Mr. Zudima. The case will be taken under revisement.